IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
                    Plaintiff,             )        Case No. 4:17-cv-00131-BYP
                                           )
        vs.                                )        Hon. Benita Y. Pearson
                                           )
S.H. BELL COMPANY,                         )
                                           )
                    Defendant.             )
_____)


**UNITED STATES' MEMORANDUM IN SUPPORT OF
MOTION FOR ENTRY OF CONSENT DECREE**

The United States seeks entry of a proposed Consent Decree, lodged with this Court on

January 18, 2017, resolving allegations that emissions of ambient manganese from a facility

owned and operated by Defendant S.H. Bell Company ("S.H. Bell") in East Liverpool, Ohio and

Ohioville, Pennsylvania (the "East Liverpool Facility") present or may present an imminent and

substantial endangerment to public health or welfare under Section 303 of the Clean Air Act

("CAA") and Section 106 of the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA").  The proposed Consent Decree would, if approved by the Court,

require S.H. Bell to implement measures to reduce emissions of manganese-laden particulate

matter, monitor and report on the levels of such airborne particulate matter crossing its Facility

boundaries, and take additional steps to address elevated concentrations as warranted.

During the public comment period, the United States received two comments from local

residents and two comments from industry-associated entities.  Having reviewed the comments,

the United States has determined that nothing therein would justify withdrawal of its consent to the proposed settlement as fair, reasonable, and consistent with the purposes of the CAA and CERCLA. The United States, therefore, requests that the Court enter the proposed Consent Decree.

## Procedural History

On January 18, 2017, the United States, at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), brought an action against S.H. Bell pursuant to CAA Section 303, 42 U.S.C. § 7603, and CERCLA Section 106, 42 U.S.C. § 9606, to obtain injunctive relief requiring S.H. Bell to take immediate steps to significantly reduce emissions and releases of manganese (a hazardous substance under CERCLA and a hazardous air pollutant under the CAA) that presents or may present an imminent and substantial endangerment to the public health, welfare, or the environment, including the health and welfare of the residents of East Liverpool. (Dkt. 1).

That same day, the United States filed a *Notice of Lodging of Consent Decree* (Dkt. 2) and lodged with the Court a proposed Consent Decree (Dkt. 2-1) between the United States and S.H. Bell to resolve the allegations in the Complaint, pending public notice and comment on the Consent Decree. In accordance with 28 C.F.R. Part 50.7, on January 25, 2017, the U.S. Department of Justice published a notice in the *Federal Register*, advising the public of the lodging of the proposed Consent Decree and inviting the public to comment on it for a 30-day period commencing with the date of publication of the notice. *See* 82 Fed. Reg. 8436-8437.

The United States received four comments during the public comment period. Two of the comments were from local residents. These comments discussed personal experiences with

environmental conditions allegedly associated with the East Liverpool Facility and requested that S.H. Bell cease operations until it can prove it is not emitting harmful pollutants and/or handles all material within contained areas. The remaining two comments were from industry-associated entities. These comments took issue with the merits of the United States' claim that manganese emissions from the East Liverpool Facility may present an imminent and substantial endangerment, but otherwise did not critique the terms and conditions of the proposed Consent Decree.

After review of these four comments, the United States continues to believe that the previously lodged proposed Consent Decree is fair, reasonable, protective of human health and the environment, in the public interest, and fully consistent with the purposes of the CAA and CERCLA. The reasons for this conclusion are explained below. The United States requests that the Court approve and enter the Consent Decree.

## **Factual Background**

The East Liverpool Facility.

S.H. Bell owns and operates the East Liverpool Facility, a bulk material handling facility consisting of a 92-acre site on the northern bank of the Ohio River, extending into both East Liverpool, Ohio and Ohioville, Pennsylvania. The Facility receives, handles, stores, and distributes materials, including manganese ore and ferromanganese. The products are typically delivered via barge or truck, stored at the site, and shipped to customers in trucks and railroad cars. The Facility also has drying, crushing, packaging, screening, and blending capabilities, and contains a barge unloading dock, truck load out sheds, a crusher, and buildings housing storage piles. The United States alleged that S.H. Bell's storing, processing, and/or handling of

manganese at the East Liverpool Facility results in airborne emissions of particulate matter containing manganese.

Health Guidelines for Manganese Exposure.

Chronic exposure to elevated concentrations of manganese in the air may lead to a permanent neurological disorder known as manganism, the symptoms of which include tremors, difficulty walking, facial muscle spasms, negative cognitive effects, and mood changes. The Agency for Toxic Substances and Disease Registry ("ATSDR"), located within the U.S. Department of Health and Human Services, generates toxicological profiles for various hazardous substances, including manganese.[1] Toxicological profiles characterize the toxicology and adverse health effects information for the hazardous substance and establish a minimal risk level ("MRL") for exposure to the substance. The MRL represents the concentration of a substance to which individuals can be exposed for specified periods of time without an appreciable risk of adverse effects. These substance-specific estimates, however, are intended to serve as screening levels, and ATSDR explicitly notes that "MRLs are not intended to define clean up or action levels for ATSDR or other Agencies."

In 2012, ATSDR issued a *Toxicological Profile for Manganese*, which included a chronic-duration (365 days or greater) inhalation MRL of 0.3 micrograms per cubic meter ($\mu$g/m$^3$).[2] The MRL refers to the so-called "respirable fraction" of manganese-containing

---

[1] ATSDR's *Toxicological Profile for Manganese* is over 500 pages in length and may be found at https://www.atsdr.cdc.gov/toxprofiles/TP.asp?id=102&tid=23.

[2] The 2012 MRL reflected a significant change from the 0.04 $\mu$g/m$^3$ MRL presented in ATSDR's draft toxicological profile (2000). During the interim, additional published health studies had reduced some of the uncertainty regarding the concentrations at which respirable manganese could result in adverse health impacts, allowing ATSDR to refine the MRL.

particles, *i.e.*, particles small enough to pass deep into lungs and enter the bloodstream. The respirable fraction of manganese is one portion of Total Suspended Particulate ("TSP") manganese, and generally constitutes 20-35% of S.H. Bell's TSP emissions. Although respirable manganese is often measured by calculating a percentage of TSP, it is generally agreed that $PM_{10}$ (particulate matter < 10 microns) analysis constitutes a more accurate measurement of the respirable fraction.

ATSDR 2010 Health Consultation.[3]

In 2008, the Ohio Environmental Protection Agency ("Ohio EPA") requested that ATSDR evaluate potential health impacts from metals on the East Liverpool community. Beginning in 1999 and consistently since 2003, Ohio EPA had sampled air in East Liverpool at three monitoring stations, including the Water Plant monitoring station located only 250 feet away from the East Liverpool Facility. ATSDR compared those recorded manganese levels against the then-current health-based standard (MRL of 0.04 $\mu g/m^3$). ATSDR evaluated the TSP data collected at the air monitoring stations and concluded that, although levels had dropped from 2006-2009, they remained consistently above the draft MRL.

In 2010, ATSDR issued a Health Consultation and concluded that "exposure to manganese concentrations in [East Liverpool] poses a public health hazard because the highest measured concentrations approach the low end of manganese air concentrations that have been associated with neurological impacts in occupational studies." The 2010 Health Consultation also concluded that manganese concentrations in outdoor air were generally highest when the

---

3  ATSDR maintains a webpage dedicated to the East Liverpool, Ohio Site at
https://www.atsdr.cdc.gov/sites/east_liverpool/. The webpage provides links to copies of the 2010 Health

Water Plant station was downwind of the East Liverpool Facility. ATSDR recommended that Ohio EPA and/or U.S. EPA should take immediate actions to reduce community exposures to manganese.

2011 U.S. EPA RARE Grant Study of Environmental Exposure to Manganese in Air.

In 2011, U.S. EPA expanded an ongoing Regional Applied Research Effort ("RARE") grant project assessing manganese impacts on certain Ohio residents to include East Liverpool residents. The study was conducted by San Francisco State University in cooperation with U.S EPA and ATSDR. Participants underwent neuropsychological tests of mood, motor, and cognitive functions. Using air monitoring data for ambient air manganese concentrations, the study performed air dispersion modeling of manganese levels for the area, and estimated ambient air manganese levels outside of the homes of study participants.

The study, published in 2015-2016, found an association for East Liverpool residents between long-term chronic environmental manganese exposure and an impairment in motor functions and lowered performance on various cognitive functions. Increased air-manganese exposure was associated with decreased psychomotor speed and dexterity, and increased hand tremor. Increasing air-manganese levels were also associated with lower neuropsychological test scores for visuospatial memory, immediate memory for daily living activities, and verbal reasoning. The results of the RARE grant study were published in five peer-reviewed scientific journal articles.

---

Consultation, the 2016 Letter Health Consultation, a Fact Sheet regarding the RARE Grant Study, and access to the air monitoring data website.

<u>Ohio EPA Enforcement Actions and S.H. Bell Operational Response</u>.

Since 2008, Ohio EPA has engaged with S.H. Bell to negotiate a series of fugitive dust controls. Ohio EPA issued Director's Final Findings and Orders ("DFFO") in 2008, 2010, and 2016. The DFFOs charge S.H. Bell with violation of OAC Rule 3745-15-07(A), which prohibits any person from maintaining a public nuisance due to, inter alia, dust emissions that endanger the public health, safety, or welfare. Pursuant to the 2008 and 2010 DFFOs, S.H. Bell implemented a series of controls and measures to reduce fugitive manganese particulate, including: storage of all manganese materials within fully enclosed buildings; prohibition on unloading unpackaged manganese materials at the river barge; installation of truck load out sheds and baghouses; paving all unpaved roads; installation of baghouses or wet suppression systems on major emissions units; and vehicular tarping.

<u>Additional East Liverpool Air Monitoring Data</u>.

In addition to TSP data which had been collected regularly since 2003, $PM_{10}$ data monitored at the Water Plant monitoring station became available beginning in June 2011. Although the initial 2011 results included several exceedances of the 0.3 µg/m$^3$ MRL, from January 2012 through August 2014, manganese emissions remained mostly below that level, with average monthly concentrations exceeding 0.3 µg/m$^3$ on no occasions in 2012, once in 2013, and once through the first eight months in 2014.

September 2014, however, saw higher concentrations of manganese recorded at the Water Plant monitoring station -- a monthly average of 0.913 µg/m$^3$ $PM_{10}$. Manganese levels dropped the next month, but in 2015 again exceeded 0.3 µg/m$^3$ as a monthly average for seven of eight months beginning in February, including very high readings in October 2015 (1.38 µg/m$^3$ $PM_{10}$).

January 2016, however, was the last monthly average to exceed 0.3 µg/m$^3$ PM$_{10}$, and manganese levels remained below the MRL throughout 2016.

ATSDR 2016 Health Consultation.

In July 2016, U.S. EPA requested that ATSDR revisit its prior Health Consultation in light of more recent manganese air monitoring results. In September 2016, ATSDR issued a letter addendum to its prior Health Consultation, concluding that based on the ambient air data (with 2015 manganese emissions higher than in 2010), the 2011 U.S. EPA RARE grant study, and additional modelling linking the East Liverpool Facility to the highest measured concentrations of manganese, "[t]he exposures in this community represent a public health hazard and should be mitigated as soon as possible to reduce harmful exposures."

S.H. Bell has vigorously disputed ATSDR's conclusions, questioning the reliability of the monitoring data, the validity of the health study's conclusions regarding actual health impacts on residents, and the identification of S.H. Bell as a primary source of the manganese impacting the communities.

**Proposed Consent Decree**

The United States and S.H. Bell disagreed as to whether conditions in East Liverpool constituted an imminent and substantial endangerment to public health or the environment and the extent to which manganese emissions from the East Liverpool Facility contributed to any such endangerment. S.H. Bell posited that the manganese sampling results from the Water Plant monitoring station may have been influenced by sources other than S.H. Bell, despite the proximity of its East Liverpool Facility to that monitoring station. As described in more detail below, the proposed Consent Decree provides a carefully tailored remedy that acknowledges the

dispute between the Parties, while providing appropriate protection to residents who live near the Facility. The proposed Consent Decree addresses these competing concerns through a three-part approach:

- S.H. Bell will obtain and report robust monitoring data to identify manganese emission levels at the East Liverpool Facility fenceline and implement an Affected Materials Tracking System and Digital Video Recording System to assess what actions or processes may cause increased manganese emissions;

- the Facility will seek to keep its manganese $PM_{10}$ emissions below the ATSDR MRL of 0.3 µg/m$^3$ through application of MRL-based Response Action Levels and, in the event of exceedances of those levels, investigate the cause of any such exceedances and implement U.S. EPA approved corrective actions; and

- S.H. Bell will implement certain prophylactic measures to reduce fugitive emissions in the near term.

Collectively these measures will identify and address any manganese emissions at the East Liverpool Facility exceeding the MRL, thereby abating the potential endangerment to local residents.

Enhanced monitoring program. Under the proposed Consent Decree, S.H. Bell will implement a fenceline monitoring program, siting filter-based $PM_{10}$ monitors to capture ambient manganese concentrations at the Facility's southern, eastern, and western boundaries. (Dkt. 2-1, Appx. A, Para. 1.) Initially, monitoring samples will be collected daily, with the potential for reduced sampling schedules if the sampling results from the monitors remain below the Response Action Levels (see below) for consecutive 12-month periods. (Dkt. 2-1, Appx. A,

Para. 5).  S.H. Bell is required to report the data from the monitors to U.S. EPA, Ohio EPA, and the Pennsylvania Department of Environmental Protection and is responsible for determining monthly and rolling annual manganese concentrations for each monitor.  This data will be made available to the public and included in U.S. EPA's air monitoring webpage for the Site.[4]

The monitoring program in the Consent Decree also requires implementation of an Affected Materials Tracking System and Digital Video Recording System to gain a more comprehensive understanding of the movement of manganese materials throughout the Facility and potential sources of manganese emissions.  The Affected Materials Tracking System will provide detailed data including dates and tonnage of manganese materials entering and leaving the Facility, and when and in what quantities the various process units handle manganese material.  (Dkt. 2-1, Para. 9.)  The Digital Video Recording System will be designed to capture each use of the manganese unloading/transfer/loading operations at several locations at the Facility.  (Dkt. 2-1, Para. 12).

Root cause analysis.  The proposed Consent Decree identifies ambient manganese Response Action Levels, the exceedance of which at a fenceline monitor requires implementation of a root cause analysis and corrective actions, as necessary.  S.H. Bell will calculate monthly average manganese concentrations and rolling annual average manganese concentrations for each monitor.  Any monitor that exceeds a monthly average 0.57 µg/m$^3$ manganese concentration or a rolling annual average manganese concentration of 0.3 µg/m$^3$ (identified as "Preventative Action Levels"), requires S.H. Bell to conduct and submit to U.S. EPA a root cause analysis – taking into consideration information and data from the Affected Materials Tracking System and Digital

---

4  U.S. EPA's webpage *East Liverpool, Ohio and Glasgow Borough, Pennsylvania – Air Monitoring Data* may be found at https://www.epa.gov/oh/east-liverpool-ohio-and-glasgow-borough-pennsylvania-air-monitoring-data.

Video Monitoring System, among other sources – that identifies any emission unit(s) at the Facility that caused or contributed to increased manganese emissions above the Preventative Action Levels.  (Dkt. 2-1, Paras. 18-19.)  The analysis is subject to U.S. EPA review and approval and must identify and provide a schedule for implementation of corrective action measures.

Additionally, if S.H. Bell calculates a monthly average manganese concentration that exceeds 1.0 µg/m$^3$ (identified as the "Exceptional Action Level"), it is required to suspend processing and barge unloading of all manganese materials, unless there have not been any daily exceedances of that level during the last 7 days of data.  (Dkt. 2-1, Para. 20)  In order to resume operations at units identified to have been at issue in the ensuing root cause analysis, S.H. Bell must implement corrective action measures and/or additional controls at those units.  (Dkt. 2-1, Paras. 21-22.)

Fugitive dust control program.  The Consent Decree requires the implementation of various fugitive dust control measures to further reduce the potential for excessive manganese emissions.  These steps include a variety of housekeeping and operational improvements such as regular sweeping, restricted access to unpaved areas, early tarping of trucks transporting manganese materials, changing of filters on vacuum and sweeper trucks, installation of rolling doors on certain storage building doors, and monitoring of baghouses for pressure drops.  (Dkt. 2-1, Paras. 13-15.)  The proposed Consent Decree also requires S.H. Bell to continue certain practices that limit potential manganese emissions by capping the tonnage of manganese materials unloaded at the river dock and prohibiting use of the KUX crusher on manganese materials without installation of a baghouse. (Dkt. 2-1, Para. 13.)

## Standard of Review

The "criteria to be applied" when a court determines whether to approve a proposed consent decree "are whether the decree is 'fair, adequate, and reasonable, as well as consistent with the public interest.'" *United States v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 489 (6th Cir. 2010), *quoting United States v. County of Muskegon*, 298 F.3d 569, 580-81 (6th Cir. 2002); *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991). This limited standard of review reflects a public policy that strongly favors settlements of disputes without protracted litigation. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976). Settlements conserve the resources of the courts, the litigants, and the taxpayers and "should . . . be upheld whenever equitable and policy considerations so permit." *Id*. at 1372. This is particularly true in disputes involving environmental violations "where voluntary compliance by the parties . . . will contribute significantly toward ultimate achievement of statutory goals." *Kelly v. Thomas Solvent Co.*, 717 F. Supp. 507, 516 (W.D. Mich. 1989) (citations omitted).

Approval of a settlement is committed to the informed discretion of the trial court. *United States v. Jones & Laughlin Steel Corp.*, 804 F.2d 348, 351 (6th Cir. 1986); *Donovan v. Robbins*, 752 F.2d 1170, 1176-77 (7th Cir. 1985); *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984). Courts, however, usually exercise this discretion in a limited and deferential manner. For example, the Court does not have the power to modify a settlement; it may only accept or reject the terms to which the parties have agreed. *Jones & Laughlin Steel Corp.*, 804 F.2d at 351; *Akzo Coatings*, 949 F.2d at 1435. Further, in reviewing a consent decree, "the controlling criteria is not what might have been agreed upon . . . nor what the district court believes might have been

the optimal settlement." *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1036 (D. Mass. 1989) (citations omitted), *aff'd,* 899 F.2d 79, 84 (1st Cir. 1990) (court determines "not whether the settlement is one which the Court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute"); *see also Officers for Justice*, 688 F.2d at 625, 630; *Thomas Solvent Co.*, 717 F. Supp. at 515.

Finally, the balancing of competing interests affected by a proposed consent decree to which the United States is a party "must be left, in the first instance, to the discretion of the Attorney General." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981). As the Sixth Circuit has noted, judicial deference to a settlement is "particularly strong" when that settlement "has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA[,] which enjoys substantial expertise in the environmental field." *Lexington-Fayette*, 591 F.3d at 490, *quoting Akzo Coatings*, 949 F.2d at 1436; *see also id*. at 1424, 1435. Thus, where an agency committed to the furtherance of the public interest has negotiated an agreement, there is a presumption of validity.

## Argument

### A. The Consent Decree Is Fair, Reasonable, and Consistent With Statutory Goals

#### 1. The Consent Decree Is Fair.

In determining whether a proposed settlement is fair, a court need only ascertain whether the terms of the proposed consent decree reflect a reasonable compromise of the litigation. *See United States v. Montrose Chem. Corp.*, 50 F.3d 741, 747 (9th Cir. 1995). As part of this analysis, courts consider "the strength of the plaintiffs' case, the good faith efforts of the

13

negotiators, the opinions of counsel, and the possible risks involved in litigation if the settlement is not approved." *United States v. Hooker Chem. & Plastics Corp.*, 607 F. Supp. 1052, 1057 (W.D.N.Y. 1985), *aff'd*, 776 F.2d 410 (2d Cir. 1985). In this case, the settlement embodied in the Consent Decree is the result of good-faith, arms-length bargaining between attorneys for the United States and S.H. Bell. After a careful analysis of the strengths and risks of litigation, the Parties arrived at a settlement that primarily requires S.H. Bell to identify the scope of ambient manganese-laden particulate matter exiting its Facility, while establishing a protocol for S.H. Bell and U.S. EPA coordination in addressing occurrences where emissions exceed the MRL. In exchange, S.H. Bell obtains resolution of the matter and avoids costly litigation of the United States' claims.

The fairness of the proposed Consent Decree is also inherent in the process by which the settlement was reached. The Parties engaged in extensive negotiations over the course of a number of months, which were carried out in face-to-face meetings as well as conference calls. They exchanged several letters and consent decree drafts. Throughout these negotiations, S.H. Bell was represented by experienced counsel well-versed in environmental law and procedure.

The proposed Consent Decree reflects the Parties' careful and informed assessment of the relative merits of each other's claims and defenses, while taking into consideration the costs and risks associated with litigating what would be a relatively complex case. Avoiding litigation benefits both Parties and spares the resources of the Court. *Cannons*, 899 F.2d at 90 ("all too often, litigation . . . can squander valuable resources"). Not only the Parties, but also the public

14

gains from the "saving of time and money that results from the voluntary settlement of litigation." *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983).

The settlement also embodies a measure of compromise on the part of both sides. As with any fair settlement, the Parties benefit from the immediate resolution of the asserted claims and defenses, while foregoing the opportunity to seek unmitigated victory. *See E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) ("Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation").

### 2.      The Consent Decree Is Reasonable.

The "reasonableness" of a Consent Decree may be determined in light of whether it is technically adequate, fully compensates the public for the alleged violations, and takes into consideration the risks of litigation. *United States v. Telluride Co.*, 849 F. Supp. 1400, 1402-03 (D. Col. 1994). When determining whether a settlement is reasonable, "the decree's likely efficaciousness as a vehicle for cleansing the environment is of cardinal importance." *Cannons*, 899 F.2d at 89. The proposed Consent Decree is more than technically adequate in that it contains specific, tailored relief that addresses the potential endangerment alleged in the Complaint. Moreover it addresses this potential endangerment in a far shorter time than if the Parties had litigated the action.

### 3.      The Consent Decree Is Consistent With Relevant Statutory Goals.

Another role of a court reviewing an environmental settlement submitted by the United States is to determine "whether the Decree comports with the goals of Congress." *Sierra Club v.*

*Coca-Cola Corp.*, 673 F. Supp. 1555, 1556 (M.D. Fla. 1987). The primary objectives of the Clean Air Act and CERCLA are to protect the public health and welfare and the environment. The Consent Decree furthers these statutory goals by addressing, without litigation delays or costs, the potential endangerment posed by emissions of airborne manganese.

**B.** **The Public Comments Do Not Justify Rejecting the Consent Decree**

In its *Notice of Lodging of Consent Decree* (Dkt. 2), the United States advised the Court that, in accordance with the procedures set forth in 28 C.F.R. Part 50.7 and Paragraph 89 of the proposed Consent Decree, the public would be provided an opportunity to comment on the proposed Consent Decree and the United States would then either notify the Court of its withdrawal of consent to the proposed settlement agreement or move this Court to enter the Decree.

The United States published notice of the proposed Consent Decree and 30-day public comment period in the *Federal Register* on January 25, 2017. 82 Fed. Reg. 8436-8437. During the comment period, the United States received four comments. Two of the comments were from local residents, "Commenter A" and Gary Craig.[5] The two remaining comments were from industry-associated groups, the Manganese Interest Group and Gradient Corp. Complete copies of all public comments received are attached hereto as Exhibits 1-4. Nothing in the public comments received leads the United States to alter its conclusion that the Consent Decree is fair, reasonable, and in the public interest.

---

5  The identity of "Commenter A" has been redacted on personal privacy grounds due to their inclusion of personal medical information in the body of the comment.

**Public Comments by Residents:**

*Commenter A and Mr. Craig both commented that the proposed Consent Decree should require S.H. Bell to cease operations until "safeguards are put in place" (Ex. 1) or "such time as they are able to prove they are no longer emitting harmful pollutants into the air" (Ex. 2). Commenter A specifically requests that all material handling, including loading and unloading, be conducted in contained areas to prevent fugitive dust emissions.  Both residential commenters discuss their personal experiences, with Commenter A referencing manganese levels in the blood of several residents, including family members, and Mr. Craig providing photographs of staining of his home caused by fugitive dust emissions.*

**United States' Response:**

The United States shares the concerns expressed by the residential commenters, but believes the proposed Consent Decree appropriately addresses those concerns.  According to ATSDR, elevated manganese levels in blood, such as referenced by Commenter A, may indicate that an individual has been exposed to excess manganese.  Mr. Craig's photographs are consistent with iron ore dust staining present on many homes located near the East Liverpool Facility and raises reasonable concerns that fugitive dust emissions from the Facility continue to impact the local environment.  It is unclear, however, to what extent manganese is present in any current dust emissions from the plant.

Under prior Ohio EPA DFFOs, S.H. Bell was ordered to store and process manganese materials in contained areas.  S.H. Bell has contended that while there may continue to be fugitive dust emissions of non-manganese materials, as arguably indicated by the staining or material loading/unloading videos, it currently appropriately addresses any potential manganese

emissions. The proposed Consent Decree both requires implementation of certain additional measures to further control potential manganese emissions, and puts into place a protocol to monitor manganese emissions and require appropriate corrective actions when there is an indication that such emissions may exceed the MRL.

The proposed Consent Decree includes a suite of fugitive dust control measures building off Ohio EPA's restrictions on storing or processing manganese materials in uncontained areas. These include requirements for more rigorous dust controls (sweeping, watering, tarping, rolling doors) and dust control maintenance (baghouse improvements, vacuum/sweeper improvements). *See* Dkt. 2-1, Paras. 13-15. Additional control measures, potentially including those identified by the residential commenters, will be imposed if warranted based on the results of the fenceline monitoring and any subsequent root cause analyses.

The proposed Consent Decree takes a purposeful and focused approach to the circumstances under which it would impose such a requirement. If the fenceline monitors show a monthly average manganese concentration of $1.0 \, \mu g/m^3$ with continuing high emissions (*i.e.* a daily exceedance of $1.0 \, \mu g/m^3$ within the past week), then S.H. Bell must effectively suspend processing and barge unloading of manganese containing materials until it identifies the process unit causing such emissions (which unit will then suspend operations until corrective action is taken) or it shows no subsequent daily manganese exceedances of $1.0 \, \mu g/m^3$ for a week. Dkt. 2-1, Paras. 20-22.

Under the proposed Consent Decree's monitoring requirements, local residents will finally know to what extent the East Liverpool Facility is contributing to potentially unhealthy levels of ambient manganese. Moreover, if the Facility is shown to be emitting manganese in

excess of the ATSDR MRL, then S.H. Bell will need to identify and abate the source of such emissions.

**Public Comments by Industry-Affiliated Entities:**

*The Manganese Interest Group and Gradient Corp. both submitted public comments taking issue with the United States' evaluation of the underlying facts and the allegations that emissions of ambient manganese constitute an "imminent and substantial endangerment." Gradient Corp. posits that an Exceptional Action Level of 10 µg/m³ would be "sufficiently health protective." The Manganese Interest Group questions whether the United States' Complaint sufficiently pled a claim under CERCLA Section 106 and CAA Section 303 to provide this Court with jurisdiction to evaluate the proposed Consent Decree.*

**United States Response:**

The United States recognizes that certain industry-affiliated entities view ATSDR's MRL, as established in the *Toxicological Profile for Manganese*, as overly conservative in terms of the amount of potential risk the public should be exposed to and question ATSDR's 2016 Health Consultation's conclusion that a public health hazard is present in East Liverpool, Ohio.[6] These views are generally consistent with arguments presented by S.H. Bell's experienced counsel during discussions with the United States. The existence of such arguments was taken into consideration by the Parties in negotiating the proposed Consent Decree.

---

6 There is, and most likely will continue to be, vigorous scientific and policy debate as to what level of exposure to airborne manganese should be considered safe. There is no doubt, however, that exposure to some level over time tends to cause very serious health effects -- the Parkinson's-like syndrome known as "manganism." Nor can there be any real doubt that the peer-reviewed RARE grant health study finding a correlation between manganese exposure and manganism symptoms in East Liverpool residents supported bringing this case.

Gradient argues that the Response Action Levels in the proposed Consent Decree are overly conservative. These levels, however, are not intended to be interpreted as an indicator that actual harm to public health is occurring when they are triggered at the Facility. Rather, they are included as part of a protocol to protect an already impacted population from further significant exposure. As described above, exceedances of the successive Response Action Levels ("preventative" and "exceptional") will trigger successively more aggressive protective steps as the measured level of ambient manganese increases. The Response Action Levels and escalating responses were carefully and vigorously negotiated by the Parties, taking into account S.H. Bell's operational needs as well as the importance of protecting the neighboring communities. The balance struck by the Parties is plainly consistent with the public interest.

Finally, the Manganese Interest Group's unsupported assertion that the Court lacks jurisdiction has no merit.[7] The United States' Complaint provides detailed allegations which are more than sufficient to set forth claims under CAA Section 303 and CERCLA Section 106. *See* Dkt. 1. While the Manganese Interest Group may disagree with the United States regarding the strength of the underlying evidence supporting those allegations, there can be no question that the claims were sufficiently pled and that the Court therefore has jurisdiction to enter this Consent Decree -- a conclusion with which both Parties agree. *See* Dkt. 2-1, Para. 2.

---

[7] The various arguments underlying the Manganese Interest Group's rather hyperbolic assertion that ATSDR's work is riddled with "fundamental distortions and falsehoods" have previously been rebutted in detail by ATSDR. *See*, *e.g.*, Letter from P. Breysse to C. Butler (Dec. 6, 2016) (attached as Ex. 5).

## Conclusion

The settlement embodied in the Consent Decree constitutes the United States' best efforts to resolve this case fully and fairly in a manner consistent with the interests of the public. Having reviewed the public comments, the United States continues to believe that the proposed Consent Decree is fair, reasonable, consistent with the purposes of the CAA and CERCLA, and in the public interest.

THEREFORE, the United States respectfully requests that the Court enter the proposed Consent Decree.

Dated:  March 28, 2017.

Respectfully submitted,

PLAINTIFF UNITED STATES

JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division


*/s/ Jeffrey A. Spector*
JEFFREY A. SPECTOR
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Phone:  (202) 514-4432
Jeffrey.Spector@usdoj.gov

DAVID A. SIERLEJA
Acting United States Attorney
STEVEN PAFFILAS
Assistant U.S. Attorney
United States Attorney's Office
801 West Superior Avenue; Suite 400
Cleveland, OH  44113
(216) 622-3698

OF COUNSEL:

JOHN C. MATSON
Associate Regional Counsel
U.S. EPA, Region 5
Office of Regional Counsel
77 W. Jackson Blvd. (C-14J)
Chicago, IL  60604

CHARLES MIKALIAN
Associate Regional Counsel
U.S. EPA, Region 5
Office of Regional Counsel
77 W. Jackson Blvd. (C-14J)
Chicago, IL  60604

HUMANE ZIA
Senior Assistant Regional Counsel
U.S. EPA, Region 3
Office of Regional Counsel
1650 Arch Street (3RC10)
Philadelphia, PA  19063

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that a copy of the foregoing *Memorandum in Support of Motion for Entry of Consent Decree* was served on this date via email upon the following individual:

     Scott R. Dismukes
     Eckert Seamans
     600 Grant Street, 44th Floor
     Pittsburgh, PA  15219
     sdismukes@eckertseamans.com


   ____3/28/2017____        ____/s/ Jeffrey A. Spector____
      Date              Jeffrey A. Spector