# Third Submission of the Manganese Interest Group (MIG) regarding United States' Memorandum in Support of Motion for Entry of Consent Decree

## *United States v. S.H. Bell Company*
Civil Action No. 4:17-cv-00131-BYP
D.J. Ref. No. 90-5-2-1-11688/1

**July 18, 2017**

**Submitted via Electronic Mail to:**
**Assistant Attorney General**
**U.S. Department of Justice**
**Environment and Natural Resources Division**
**P.O. Box 7611**
**Washington, D.C. 20044-7611**
pubcomment-ees.enrd@usdoj.gov

cc:  Clerk of the Court, United States District Court, Northern District of Ohio, Eastern Division

U.S. Department of Justice Docket No. OLP 164

**Submitted by counsel on behalf of the Manganese Interest Group:**
Joseph J. Green
Kelley Drye & Warren, LLP
3050 K Street, N.W.
Washington, D.C. 20007
202.342.8849
JGreen@KelleyDrye.com

The Manganese Interest Group ("the Group" or "MIG")[1] writes to request that the Department of Justice ("DOJ") and U.S. Environmental Protection Agency ("EPA") address as part of its forthcoming response to the Court's Order dated July 7, 2017 another important jurisdictional requirement set forth in section 303 of the Clean Air Act ("Act"). Section 303 of the Act clearly provides:

> *Prior to taking any action under this section*, the Administrator *shall consult* with appropriate State and local authorities and attempt *to confirm the accuracy of the information on which the action is proposed to be taken is based*.[2]

Nothing in the Complaint, the proposed consent decree, or the Government's motion for entry of the consent decree explains how, if at all, the Government consulted with "appropriate State and local authorities" to "confirm the accuracy of the information" on which it has relied to support the action against S.H. Bell, as required by section 303 of the Act. Instead, the complaint merely notes that "[t]he United States has provided notice of the commencement of this action to the Ohio Environmental Protection Agency ("Ohio EPA") and the Pennsylvania Department of Environmental Protection ("PADEP") pursuant to CAA section 113(b), 42 U.S.C. § 7413(b)." Notice under section 113(b) of the Act is not the same thing as consultation under section 303 of the Act.

Had the necessary consultations occurred, moreover, the available evidence clearly suggests that the Government **_would not have been able to confirm_** the existence of an imminent and substantial endangerment to the East Liverpool community. First, as noted in MIG's initial comments on the proposed consent decree, Ohio EPA formally objected to the conclusions of the "health consultation" completed by the Agency for Toxic Substances and Disease Registry ("ATSDR") in September of 2016. **As the Ohio EPA's November 10, 2016 letter to ATSDR plainly states, "the conclusions in this report are not scientifically supportable and completely undermine any conclusions made that a 'public health hazard' is present to the East Liverpool community."**[3]

Second, and equally important, the Ohio EPA had already taken appropriate state action in October 2016 to ensure a further reduction of manganese emissions from the S.H. Bell facility to ensure ambient concentration levels at or below the ATSDR "minimal risk level" ("MRL") of 0.3 µg/m$^3$ in the East Liverpool community. As plainly reflected in the attached Director's Final Findings and Order ("DFFO") dated October 4, 2016, the "Ohio EPA has concluded that emissions from Respondent's Facility still cause or

---

[1] As previously noted, MIG is *an ad hoc* coalition of trade associations and companies interested in the scientifically sound evaluation and regulation of manganese. Membership is comprised of steel producers, metalworkers, chemical manufacturers, ferroalloy producers, and other similar stakeholders.

[2] 42 U.S.C. § 7603 (emphasis added).

[3] A copy of the Ohio EPA's November 10, 2016 letter ATSDR is Attachment 1 to this submission.

1

significantly contribute to unacceptable ambient air concentrations of manganese" and that "Respondent must take additional actions to address manganese emissions."[4]

The Government has nowhere explained for the Court's benefit how "an imminent and substantial endangerment" requiring the exercise of the federal Government's "emergency powers" under the Act can plausibly (much less conceivably) exist when **the Ohio EPA has already undertaken regulatory action to achieve exactly the same objective** as the Government's complaint against and proposed consent decree with S.H. Bell (*i.e.,* ambient concentrations of manganese in East Liverpool, Ohio at or below the ATSDR MRL of 0.3 µg/m$^3$).

* * * * *

For the reasons noted above and in MIG's earlier comments, the Court before which the S.H. Bell matter rests lacks jurisdiction to enter the Consent Decree imposed on S.H. Bell by the federal government because there is no colorable evidence of an "imminent and substantial endangerment" to the residents of East Liverpool, Ohio. MIG respectfully requests, once again, that DOJ address in detail all of the substantive jurisdictional arguments raised previously by MIG in its comments, as supplemented by this new information, for the benefit of the Court's ongoing deliberations.

---

[4] The Ohio EPA's October 2016 DFFO is Attachment 2 to this submission. Although the Government's Motion for Entry of the Consent Decree refers in passing to the October 2016 DFFO, it inexplicably fails to describe its content.



John R. Kasich, Governor
Mary Taylor, Lt. Governor
Craig W. Butler, Director

November 10, 2016

Michelle Colledge
Environmental Health Scientist
Agency for Toxic Substances and Disease Registry
Central Branch, Region 5
77 W. Jackson Blvd., Room 413
Chicago, IL  60604

Dear Ms. Colledge:

Without consultation or notification to the State of Ohio, we learned that on July 21, 2016, the U.S. EPA Air and Radiation Division-Air Enforcement and Compliance Assurance Branch (USEPA) requested technical public health assistance from the Agency for Toxic Substances and Disease Registry, Region 5 (ATSDR).  Specifically, USEPA asked, "**are current concentrations of manganese being measured in ambient air around the site a threat to human health?**" (See ATSDR September 22, 2016 report to USEPA, emphasis in the original.)

As this brief letter describes, the conclusions in this report are not scientifically supportable and completely undermine any conclusions made that a "public health hazard" is present to the East Liverpool community.  Further, the misleading conclusions that historic and current enforcement efforts by the Ohio EPA have not been successful in significantly decreasing manganese exposure are not only completely erroneous, but go beyond the scope of the request from USEPA, and therefore questions why ATSDR felt compelled to comment about Ohio's efforts to date. Therefore, I must demand that the September 22, 2016, ATSDR report be abandoned and redone using all currently available data and scientifically supportable analytical methods.

ATSDR report's significant and substantive analytical failures:

1. Failure to evaluate the scientifically relevant manganese particle (respirable fraction – Mn PM10), instead relying entirely on total suspended particulate (TSP), even though ATSDR itself acknowledged that the MRL is based on the respirable fraction.
2. Application of an outdated and irrelevant 1993 USEPA RfC of 0.05, instead of solely relying on ATSDR's own 0.3 MRL. USEPA has officially recognized that ATSDR's MRL should be used over the RfC for Mn (see Proposed Feroalloy NESHAP, 79 Fed. Reg. 60238, 60247 (2014) and Final Ferroalloy NESHAP, 80 Fed. Reg. 37366, 37375 (2015)).
3. Failure to acknowledge, as does USEPA, that airborne respirable fraction concentrations of Mn below the MRL for a pollutant are unlikely to cause harmful health effects (https://www.epa.gov/oh/east-liverpool-and-glasgow-borough-pennsylvania-air-monitoring-data).

4. Failure to utilize the most relevant and acceptable time-series statistical methods that account for autocorrelation, cyclicity or seasonal variation in the data used to support Mn concentration trend through time. These underlying data structures must be evaluated to determine if a significant trend is present. The R-statistical program has these routines but ATSDR failed to utilize it in their trend analysis.
5. Use of dated and controverted studies such as one from 2010 by San Francisco State University (http://online.sfsu.edu/mnstudy/study.html) that no longer accurately reflects the exposure levels in the community and fails to recognize that any subtle differences between populations were within statistical normal ranges.

Moreover, and in addition to the analytical failures by ATSDR, the absence of peer-review is striking. Certainly, these obvious errors and omissions would have been identified and corrected had ATSDR either sought credible peer-review or, at a minimum, input from Ohio EPA in advance of publication. In fact, Ohio EPA could have given ATSDR updated data just as it has in the past. For example, ATSDR told Ohio Department of Health back in 2011 that the PM10 data on metals was critical to evaluating health impacts and received PM10 data from Ohio EPA. ATSDR was well aware that the Ohio EPA has been actively collecting Mn PM10 data from filters in East Liverpool and also that Ohio EPA had compliance-enforcement orders with the S.H. Bell facility.

ATSDR has long been a credible resource and partner for the Ohio EPA. However, it is not unreasonable to reach a jaundiced view of ATSDR's conclusions in this report in light of the departure from appropriate and accepted scientific/statistical standards. Consequently, I must demand that the September 22, 2016, ATSDR report be abandoned and redone using all currently available data and scientifically supportable analytical methods. Ohio EPA stands ready to collaborate with ATSDR to participate in an appropriate review and analysis of the most current data available, using defensible standards and acceptable peer review of results.

Sincerely,

Craig W. Butler
Director



John R. Kasich, Governor
Mary Taylor, Lt. Governor
Craig W. Butler, Director

October 4, 2016

**CERTIFIED MAIL**

John M. Bell
President
S.H. Bell Company
2217 Michigan Avenue
East Liverpool, Ohio 43920

Re: Final Findings and Orders for violations of Ohio's air pollution regulations

Dear Mr. Bell:

Transmitted herewith are the Final Findings and Orders ("Orders") of the Director of Ohio EPA concerning the above-referenced matter.

Please note that the effective date of the Orders is the date that the Orders were entered into the Ohio EPA Director's journal, which is the date that is stamped on the first page of the Orders.

Sincerely,

James Kavalec, Manager
Compliance/Enforcement Section
Division of Air Pollution Control

xc: James Lee, PIC
    Drew Bergman, Legal Office
    Ed Fasko, DAPC-NEDO
    Jennifer Kurko, DAPC-NEDO

**BEFORE THE**

**OHIO ENVIRONMENTAL PROTECTION AGENCY**

In the Matter of:

| | |
|---|---|
| **S.H. Bell Company** <br> **Stateline Facility** <br> 2217 Michigan Avenue <br> East Liverpool, Ohio 43920 | ) <br> ) <br> ) **Director's Final Findings** <br> ) **and Orders** |

## I. JURISDICTION

These Director's Final Findings and Orders ("DFFOs") are issued to S.H. Bell Company ("Respondent") pursuant to the authority vested in the Director of the Ohio Environmental Protection Agency ("Ohio EPA") under Ohio Revised Code ("ORC") § 3704.03 and § 3745.01.

## II. PARTIES BOUND

These DFFOs contain both "Findings" and "Orders." The Orders shall apply to and be binding upon Respondent and successors in interest liable under Ohio law. No change in ownership of Respondent or of the facilities (as hereinafter defined) shall in any way alter Respondent's obligations under these Orders.

## III. DEFINITIONS

1. Unless otherwise stated, all terms used in these DFFOs shall have the same meaning as defined in ORC Chapter 3704 and the rules promulgated thereunder.

2. The term "affected materials" shall mean ferromanganese materials and other materials with a manganese content (raw material, intermediate, or finished product) that are processed or otherwise handled on site in such a manner that could cause the generation of stack or fugitive emissions containing ferromanganese or manganese compounds. Affected materials shall not include materials that contain manganese, such as steel ingots, where the material is not a source of stack or fugitive emissions containing ferromanganese or manganese compounds.

3. The term "total suspended particulate" shall mean the total amount of particles collected on air monitor filters that constitute inhalable particulate matter (the total airborne particles inhaled through the nose and mouth).

I certify this to be a true and accurate copy of the official documents as filed in the records of the Ohio Environmental Protection Agency.

By: _____ Date: 10-4-2016

4. The term "respirable fraction" shall mean that fraction of inhaled particles capable of passing beyond the larynx and ciliated airways, respectively, during inhalation, commonly considered to be particulate matter less than 10 micrometers in aerodynamic diameter ($PM_{10}$).

## IV. FINDINGS

All of the Findings necessary for the issuance of these Orders pursuant to ORC sections 3704.03 and 3745.01 have been made and are outlined below. Nothing in the Findings shall be considered to be an admission by Respondent of any matter of law or fact. The Director of Ohio EPA makes the following Findings:

1. Respondent owns and operates one Ohio facility, the Stateline Facility, that handles, processes, and stores ferroalloys and other materials. The Stateline Facility is located at 2217 Michigan Avenue in East Liverpool, Ohio, and is identified by Ohio EPA facility identification number 0215020225. A portion of the Stateline Facility is located in Pennsylvania and is not regulated by the Ohio EPA. Respondent is a "person" as defined by ORC § 3704.01(O) and Ohio Administrative Code ("OAC") Rule 3745-15-01(U).

2. At the Ohio side of the Stateline Facility, Respondent operates the following emissions units: roadways (F001), storage piles (F002), material handling (internal transfers) (F003), Trico box filling unit (F004), Carmen palletizing station (F005), Area C crusher - screener (F006), Area C screener (F007), north bag filling station (F008), two portable scalp screen boxes (F009), east bag filling station (F011), PA screener (F012), truck dump (unloading of incoming materials) (F013), river barge unloading by crane (F014), railcar unloading and loading (F015), straight-sided barge dock unloading (F016), Frac Sand Handling-Direct Transfer (F017), Frac Sand Storage and Loadout (F018), emergency diesel-fired electrical generator (P003), rotary dryer (P901), truck loadout shed (P902), and hammermill crushing system (P903). At the Pennsylvania side of the Stateline Facility, Respondent operates the following emissions units: roadways (P006), storage piles (P007), barge unloading (P004), miscellaneous material handling (including, but not limited to, barge unloading and truck dump unloading) (P005), KUX Crusher (P001), fine-size screener (P002), and portable scalp screen boxes (P003), Frac Sand Handling-Direct Transfer (not established), and Frac Sand Storage and Loadout (not established). Each of these emissions units is an "air contaminant source" as defined in OAC Rule 3745-15-01(B) and (W), and emits particulate matter as defined in OAC Rule 3745-17-01(B)(13). Some of the particulate matter emissions consist of or include affected materials.

3. OAC Rule 3745-15-07(A) prohibits any person from causing, permitting, or maintaining a public nuisance due to the emission or escape into the open air from any source or sources of smoke, ashes, dust, dirt, grime, acids, fumes, gases, vapors, or any other substances or combinations of substances, in such manner or in such amounts as

to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property.

4. The emissions of affected materials from Respondent's Facility cause or significantly contribute to elevated ambient air concentrations of manganese at the Michigan Avenue (Water Plant) ambient monitor in East Liverpool, Ohio.

5. U.S. EPA has recently updated its assessment of manganese toxicity to follow the Agency for Toxic Substances and Disease Registry (ATSDR) minimum risk level (MRL) for manganese of 0.3 µg/m$^3$. The MRL is the appropriate health-based risk comparison level, as recognized by both U.S. EPA and ATSDR's most recent guidance, based upon scientific literature that evaluates exposure to specific pollutants and their associated health effects in human or animal studies. Specifically, the manganese MRL was developed as an estimate of chronic inhalation exposure that is likely to be without appreciable risk of adverse non-cancer effects during a lifetime. Accordingly, annual average ambient air concentrations of manganese that are below the manganese MRL are not likely to cause health effects. It should be emphasized that, based on US EPA Risk Assessment Guidance for Superfund (RAGS) (1989), the appropriate metric for comparison with a chronic MRL is an annual average exposure concentration. ATSDR MRLs are now used preferentially instead of the U.S. EPA Reference Concentration (RfC) for manganese, which was established in 1993 and has not been updated since then.

6. In a letter to U.S. EPA Region 5 dated September 22, 2016, ATSDR Region 5 evaluated the concentrations of manganese being emitted from the Facility and recognized that the MRL values are based on the respirable fraction of manganese-containing particulates and that the respirable fraction is less than 10 microns. Usage of the respirable fraction is the most relevant measurement for assessing the potential toxicity of airborne concentrations of manganese near the Facility. While Total Suspended Particulate (TSP) samples in general quantify the inhalable fraction of particulate pollution (the total airborne particles inhaled through the nose and mouth), the most current scientific risk comparison values are based upon measurements of the respirable fraction, particles that pass deep into the lung. Prior to the release of the most recent ATSDR report, the accepted method of the measurement of metal in the ambient air was by a hi-volume sampler that measures TSP. Ohio EPA has always asserted, as has Respondent in the response letter sent to Ohio EPA dated April 1, 2016 and as ATSDR does now, that the respirable fraction ($PM_{10}$) is more appropriate for determining health impacts. However, even when reviewing TSP values, higher TSP values have been trending downward in 2016 after a series of actions taken by Ohio EPA.

7. A detailed $PM_{10}$ respirable fraction data analysis has recently been completed for calendar year 2015 and the first eight months of 2016 by Ohio EPA. For 2015, the monthly $PM_{10}$ concentrations were 0.08, 0.08, 0.47, 0.32, 0.18, 0.42, 0.38, 0.62, 0.34, 1.38, 0.25, and 0.15 µg/m$^3$. The resultant $PM_{10}$ annual average for 2015 was 0.39 µg/m$^3$, which is above the ATSDR MRL. The January – August 2016

manganese $PM_{10}$ monthly averages are 0.361, 0.088, 0.089 0.194, 0.207, 0.052, and 0.034, and 0.11, respectively. The average manganese $PM_{10}$ for the first eight months of 2016 is 0.15 $\mu g/m^3$. The monthly average $PM_{10}$ concentration for July 2015 through July 2016 is 0.324 $\mu g/m^3$, which remains above the MRL of 0.30 $\mu g/m^3$. The monthly average for the most recent 12 months available (August 2015 – August 2016) decreases to 0.303 $\mu g/m^3$, which is still slightly above the MRL. Analysis of the PM-10 respirable fraction data indicates all values are below the established NAAQS for PM-10.

8. Since 2008, Ohio EPA has taken a series of actions to reduce the amount of manganese in the ambient air in the vicinity of East Liverpool, including:

- Issuing first set of DFFOs on April 14, 2008 to Respondent which required particulate controls for manganese.
- Issuing second set of DFFOs to Respondent on February 8, 2010 to further reduce particulates containing manganese.
- Monitoring for manganese in ambient air from 2010 - 2013. Monitoring during this time period showed that concentrations had been reduced from 2010 levels.
- Conducting an investigation into the 2014 elevated manganese levels at the water plant monitor. This investigation revealed that the water treatment plant had been sand blasting a tank at the site at approximately same time period of higher concentrations.
- Beginning more frequent inspections to evaluate compliance of the Facility in January of 2016 after detecting higher readings at the water plant monitor toward the end of 2015. A February 2016 inspection showed only two housekeeping violations that were quickly remedied.
- Initiating discussions with Respondent in March 2016 with the goal of further lowering emissions of particulates and manganese.
- Requesting Respondent to install additional controls and Respondent submits a plan on April 1, 2016 for additional controls at the Facility.

9. In general, the actions taken by Ohio EPA have reduced manganese emissions in East Liverpool, Ohio. In calendar years 2011-2013, the TSP manganese annual averages decreased from the 2010 annual average of 1.58 $\mu g/m^3$ to 0.94, 0.74, and 0.89 $\mu g/m^3$ for years 2011-2013, respectively. For 2014-2015 the TSP annual average rose to 1.63 $\mu g/m^3$ for 2014 to a high annual average of 2.54 $\mu g/m^3$ for 2015. The TSP annual average returned to 0.88 $\mu g/m^3$ for the first six months of 2016.

10. Respondent is in substantial compliance with the 2008 and 2010 DFFOs as noted in the May 22, 2011, February 23, 2015, January 11, 2016, April 27, 2016, and July 11, 2016 inspections. Although the February 4, 2016 inspection found two minor

violations, Respondent was quick to bring the emissions units back into compliance as noted in their February 26, 2016 response letter. Respondent sent a response letter on April 1, 2016 as a result of the March 22, 2016 meeting with Ohio EPA and committed to several additional control measures.

11. Although these additional control measures have made some progress in bringing down manganese emissions, Ohio EPA has determined that more should be done to reduce the respirable fraction exposure of manganese. Based on the evaluation of the ambient air quality data, Ohio EPA has concluded that emissions from Respondent's Facility still cause or significantly contribute to unacceptable ambient air concentrations of manganese and, as a result, Respondent has violated and is violating OAC Rule 3745-15-07(A) and ORC § 3704.05(C). The Director finds that Respondent must take additional actions to address manganese emissions and these DFFOs supplement, and do not supersede, the 2008 and 2010 DFFOs.

12. The Director has given consideration to, and based his determination on evidence relating to the technical feasibility and economic reasonableness of complying with the following Orders and their benefits to the people of the State to be derived from such compliance.

## V. ORDERS

The Director hereby issues the following Orders:

1. To reduce the emissions of affected materials that are causing or significantly contributing to the ambient air levels of manganese which the Ohio EPA has measured at the ambient air monitors in the City of East Liverpool, Respondent shall comply with the requirements of Orders 2 through 4 as expeditiously as practicable, but not later than the deadlines specified therein. Where applicable, Respondent has voluntarily agreed to apply the control measures specified in these Orders to that part of its Stateline Facility located in Pennsylvania.

2. Within fourteen (14) days of the effective date of these DFFOs, Respondent shall provide a letter to Ohio EPA certifying completion of the enhancements to Respondent's fugitive dust controls as described in Respondent's Supplement to the Phase IV Engineering Study required by the 2008 DFFOs, attached to the letter from Scott R. Dismukes to Drew Bergman dated April 1, 2016. This letter shall include details regarding the timing of when these enhancements were completed and provide support documentation thereof.

3. Within sixty (60) days after the effective date of these DFFOs, Respondent shall submit for Ohio EPA's review and approval an engineering study conducted by an independent third-party consultant with experience in the field of air pollution control that

evaluates any additional actions that Respondent can take to address airborne manganese emissions at the facilities.

4.  As soon as possible after the effective date of these DFFOs, Respondent shall meet with Ohio EPA to define the scope, process, and timelines for an engineering study conducted by an independent third-party consultant with experience in the field of air pollution control that evaluates the proportional contribution of Respondent's Facility to the ambient air levels of manganese as measured by the Ohio EPA total particulate and $PM_{10}$ ambient air monitors in the City of East Liverpool. Within thirty (30) days after the effective date of these DFFOs, Respondent shall propose a plan on the scope, process, and timelines for this study.

## VI. TERMINATION

Respondent's obligations under these Orders shall terminate when Respondent certifies in writing and demonstrates to the satisfaction of Ohio EPA that Respondent has performed all obligations under these Orders, these obligations have been embedded in operation permits, and the Chief of Ohio EPA's Division of Air Pollution Control acknowledges, in writing, the termination of these Orders. If Ohio EPA does not agree that all obligations have been performed, then Ohio EPA will notify Respondent of the obligations that have not been performed, in which case Respondent shall have an opportunity to address any such deficiencies and seek termination as described above.

The certification shall contain the following attestation: "I certify that the information contained in or accompanying this certification is true, accurate and complete."

This certification shall be submitted by Respondent to Ohio EPA and shall be signed by a responsible official of Respondent. For purposes of these Orders, a responsible official is as defined in OAC Rule 3745-33-03(D)(1) for a corporation, or a corporate officer who is in charge of a principal business function of Respondent.

## VII. OTHER CLAIMS

Nothing in these Orders shall constitute or be construed as a release from any claim, cause of action or demand in law or equity against any person, firm, partnership or corporation, not a party to these Orders, for any liability arising from, or related to, operations by Respondent.

## VIII. OTHER APPLICABLE LAWS

All actions required to be taken pursuant to these Orders shall be undertaken in accordance with the requirements of all applicable local, state and federal laws and regulations. These Orders do not waive or compromise the applicability and enforcement of any other statutes or regulations applicable to Respondent.

## IX. MODIFICATIONS

These Orders may be modified by agreement of the parties hereto. Modifications shall be in writing and shall be effective on the date entered in the journal of the Director of Ohio EPA.

## X. NOTICE

All documents required to be submitted by Respondent pursuant to these Orders shall be addressed to:

> Ohio Environmental Protection Agency
> Northeast District Office
> Division of Air Pollution Control
> 2110 E. Aurora Rd.
> Twinsburg, Ohio 44087
> Attention: Ed Fasko

and to:

> Ohio EPA
> Division of Air Pollution Control
> P.O. Box 1049
> Columbus, Ohio 43216-1049
> Attention: Jim Kavalec, Manager
> Compliance and Enforcement Section

or to such persons and addresses as may hereafter be otherwise specified in writing by Ohio EPA.

## XI. RESERVATION OF RIGHTS

Ohio EPA and Respondent each reserve all rights, privileges and causes of action, except as specifically waived in Section XII of these Orders.

## XII. WAIVER

In order to resolve disputed claims, without admission of fact, violation or liability, and in lieu of further enforcement action by Ohio EPA for only the violations specifically cited in these Orders, Respondent consents to the issuance of these Orders and agrees to comply with these Orders. Compliance with these Orders shall be a full accord and

satisfaction for Respondent's liability for the violations specifically cited herein.

Respondent hereby waives the right to appeal the issuance, terms and conditions, and service of these Orders and Respondent hereby waives any and all rights Respondent may have to seek administrative or judicial review of these Orders either in law or equity.

Notwithstanding the preceding, Ohio EPA and Respondent agree that if these Orders are appealed by any other party to the Environmental Review Appeals Commission, or any court, Respondent retains the right to intervene and participate in such appeal. In such an event, Respondent shall continue to comply with these Orders notwithstanding such appeal and intervention unless these Orders are stayed, vacated or modified.

## XIII. EFFECTIVE DATE

The effective date of these Orders is the date these Orders are entered into the Ohio EPA Director's journal.

## XIV. SIGNATORY AUTHORITY

Each undersigned representative of a party to these Orders certifies that he or she is fully authorized to enter into these Orders and to legally bind such party to these Orders.

**ORDERED AND AGREED:**

**Ohio Environmental Protection Agency**

_____ (for CWB)    10-4-16
Craig W. Butler                              Date
Director


**AGREED:**

**S.H. Bell Company**

_____    4 October 2016
Signature                          Date

____John M. Bell_____
Printed or Typed Name

____President_____
Title